David Ward
Arthur D. Grossman
MANDELBAUM, SALSBURG, GOLD,
 LAZRIS & DISCENZA, P.C.
155 Prospect Avenue
West Orange, New Jersey 07052
Tel:  (973) 736-4600


Lawrence Rosenthal
Matthew W. Siegal
Angie M. Hankins
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038
Tel: (212) 806-5400

*Attorneys for Plaintiff FUJIFILM Corporation*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

----------------------------------------------------------------- x
                                                                  )   Case No. 05-1863 (KSH)(PS)
FUJIFILM CORPORATION                                              )
                                              Plaintiff,          )
                                                                  )
                        v.                                        )
                                                                  )
JACK C. BENUN                                                     )
JAZZ PRODUCTS LLC,                                                )
POLYTECH ENTERPRISE LTD., and                                     )
POLYTECH CAMERA (SHENZHEN) CO. LTD.,                              )
                                                                  )
                                              Defendants.         )
                                                                  )
----------------------------------------------------------------- x

**OPPOSITION OF FUJIFILM CORPORATION TO MOTION BY
<u>NON PARTY COSIMO BORRELLI TO VACATE WRIT OF ATTACHMENT</u>**

NY 72240655

- i -

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. FACTUAL BACKGROUND ................................................................................................... 3

    A. The Jazz Estate Owes Money to Fuji and Polytech ..................................................... 3

    B. The Source of the Attached Funds ................................................................................ 5

    C. The Jazz Liquidation Trustee Attempted to Fix the Amounts of the Various Claims Against the Jazz Estate ................................................................. 5

    D. Agfa Contrived Its Claim Against the Jazz Estate ....................................................... 6

    E. Fuji Obtained the Writ Before the Security Agreement Was Recorded in New Jersey .................................................................................................... 6

    F. The Bankruptcy Court May Have Fixed Agfa's Claims, But the Attached Funds Are Still the Property of the Jazz Estate ................................................. 7

III. LEGAL ANALYSIS .................................................................................................................. 9

    A. The Security Agreement has no Effect on Agfa's Claims Against the Jazz Estate .... 9

    B. Agfa Never Perfected Its Security Interest ................................................................ 10

    C. The Financing Statement Was Recorded After Fuji Became a Lien Creditor ........ 13

IV. CONCLUSION ........................................................................................................................ 13

- i -

# TABLE OF AUTHORITIES

**CASES**

<u>In re Barrington</u>,
    34 B.R. 55 (Bankr. M.D. Fla. 1983) .................................................................................. 12

<u>Massachusetts Mutual Life Insurance Co. v. Central Penn National Bank</u>,
    372 F.Supp. 1027 (E.D.Pa. 1974) ...................................................................................... 13

<u>McFarland v. Brier</u>,
    850 A.2d 965 (R.I. 2004) ..................................................................................................... 9

<u>Shaw Mudge & Co v. Sher-Mart Manufacturing Co.</u>,
    132 N.J. Super. 517 (App. Div. 1975) ............................................................................... 10

<u>Telefest, Inc. v. VU-TV, Inc.</u>,
    591 F.Supp. 1368 (D.N.J. 1984) ........................................................................................ 10

<u>U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC</u>,
    519 F.Supp. 2d 515 (E.D.Pa. 2007) ................................................................................... 12

**STATUTES**

New York Uniform Commercial Code § 9-301 to 309 .................................................. 10, 11, 12, 13

I.      **PRELIMINARY STATEMENT**

Plaintiff FUJIFILM Corporation ("Fuji") hereby opposes the motion of non-party Cosimo Borrelli, a liquidator of AgfaPhoto Hong Kong Limited ("Agfa"), seeking to vacate the Writ of Attachment (the "Writ") to the extent it attaches money he claims is the subject of a first priority security interest of Agfa. Fuji opposes on the grounds the relevant Credit and Security Agreement effective March 24, 2005 (the "Security Agreement") between Agfa and Polytech Enterprise, Ltd. ("Polytech") expired, by its own terms, on September 30, 2005. D.E. 431-6, Goldstein Ex. C. Also, the expired Security Agreement was registered in New Jersey, which was the wrong jurisdiction and ineffective to perfect the interest, even if the Security Agreement had still been in force. Finally, the Security Agreement granted a security interest in accounts receivable owed by Polytech to Agfa, whereas the attached funds are not those assets, but assets of the Jazz Photo Corp. bankruptcy estate (the "Jazz Estate") that are owed to Polytech as a result of Polytech's claims against the Jazz Estate. Furthermore, the Bankruptcy Court's Stipulation and Order between Agfa, Polytech and the Jazz Estate dated October 31, 2005, cited in Agfa's brief, merely established the amount of Agfa's claim. It did not assign actual funds. Thus, Agfa's arguments regarding an assignment of the actual money in the Jazz Estate's bank accounts are not accurate. Accordingly, Agfa is nothing more than an unsecured creditor of Polytech and cannot undo any portion of the Writ. Fuji offers the accompanying Declaration of Matthew W. Siegal ("Siegal Dec.").

Agfa claims that beginning in July 2004, it sold film to Polytech, which Polytech used in 2004 and in 2005 to aid and abet Polytech's manufacture and sale of single use cameras that infringed Fuji's patents. Agfa Brief at 3. Agfa claims to be an innocent victim that is owed money by Polytech and suggests that the equities favor it over Fuji. However, as one of five major international film corporations (including Fuji, Kodak, Konica and Imation) and one of Fuji's worldwide competitors, Agfa was well aware of Fuji's single use camera lawsuits with Jazz Photo Corp. ("Jazz Photo") and had full knowledge of the use Polytech was making of

- 1 -

Agfa's film.  As an active participant in the Jazz Photo bankruptcy, Agfa was well aware that Jazz Photo was operating in bankruptcy as a result of its infringing activities and by 2005, was on the verge of liquidation.  Moreover, Agfa had been in communication with Jack Benun ("Benun"), to ensure the continued flow of film to Polytech, so that Jazz Products LLC ("Jazz Products"), formerly Ribi Tech Products LLC, could seamlessly take the place of Jazz Photo and continue the infringement of Fuji's patents.  Agfa was hardly an innocent victim.

The scheme devised by Benun, Polytech and Agfa involved the preparation of the Security Agreement.  Although Agfa's papers consistently describe the "as of" date of the agreement as March 24, 2005, there is no indication as to when the Security Agreement was actually signed, nor how long after the fact it was back-dated.

More importantly, the Security Agreement expired, on its face, on September 30, 2005.  The Security Agreement clearly indicates in paragraph 14 (page 9), that "This Agreement shall terminate upon the earlier to occur of … (c) September 30, 2005 (the "Termination Date")."  Accordingly, the so called perfected security interest on which Agfa relies, is based on a Security Agreement that on its face expired over four years ago and over a month before Agfa recorded the Security Agreement in New Jersey on November 14, 2005, the day before the hearing on Fuji's motion for the Writ.  D.E. 431-8, Goldstein Ex. E.

Even if the Security Agreement had not terminated, Agfa's security interest was not perfected, because the Security Agreement was recorded in the wrong jurisdiction.  The Security Agreement was between Polytech and Agfa, both Hong Kong corporations.  The security was the accounts receivable owed by the Jazz Estate to Polytech, inter alia.  Thus, as explained below, the appropriate location for recording the interest would have been Hong Kong or under certain circumstances, Washington, DC.  Neither party to the Security Agreement was a New Jersey corporation and neither had a place of business in New Jersey.  Accordingly, the recordation in New Jersey was ineffective to perfect the security interest, even if the Security Agreement had not expired.  Moreover, that filing occurred after the Temporary Restraining Order ("TRO") was

- 2 -

already in place. D.E. 71. Thus, Fuji's Lien Creditor status pre-dates any secured creditor status Agfa asserts in its motion.

Finally, Agfa argues that the money in question is not Polytech's money. Rather, Agfa claims that the money in question is an asset, like a bank account or a collection of rare coins, that has been assigned to them. The cases relied on by Agfa for this argument relate to assignments of specific, identifiable assets, like an estate or a right to collect on a debt. Here, the money at issue is still part of the Jazz Estate. The Jazz Estate owes money to Polytech, but much more to Fuji. Both the money owed to Fuji and the money owed to Agfa are described in Court orders. The money owed to Polytech has not yet been transferred to Polytech. The most Polytech could do in 2005 was transfer whatever interest Polytech had in the money, but not ownership of the money itself. Accordingly, the cases cited by Agfa where, for example, an entire estate was assigned, are inapposite. More importantly, whatever rights were given to Agfa expired and the interest in the money reverted to Polytech upon expiration of the improperly recorded, and therefore, unperfected Security Agreement.

Accordingly, Agfa's motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     The Jazz Estate Owes Money to Fuji and Polytech

On March 18, 2003, with the knowledge of Polytech, judgment was entered for Fuji against Jazz Photo for almost $30 million dollars for infringing Fuji's patents from 1995 through August 21, 2001. Fuji Photo Film Co. v. Jazz Photo Corp., Case No. 99-29337-FSH, Final Order and Judgment (D.N.J. Mar. 18, 2003). Fuji's settlement with the Jazz Estate set the Estate's liability to Fuji at over $40 million pre-petition. Siegal Ex. 1. Fuji settled its post-petition claim for $6,000,000. Id.

In April 2003, Polytech began selling single use cameras to Jazz Photo with, in all likelihood, full knowledge of Jazz Photo's bankruptcy plans. On May 20, 2003, Jazz Photo filed a voluntary petition under Chapter 11 of the bankruptcy code. In re Jazz, Case No. 03-

- 3 -

26565(MS). On August 22, 2003, Jessie Szeto helped Kitty Wong file Polytech's proof of claim, asserting that during the month or so it had been supplying Jazz Photo with cameras, Polytech ran up a pre-bankruptcy petition claim against Jazz Photo for $1,427,240.00. Siegal Ex. 2, Polytech Proof of Claim. This enabled Polytech to become Jazz Photo's second largest creditor. It appointed Leon Silvera to serve as its representative to the creditors committee and he became Committee Chairman.

By February 2005, the Jazz Photo bankruptcy was on its last leg. The Bankruptcy Court would soon order Jazz Photo to cease all operations by March 1, 2005. Siegal Ex. 3. Jazz Photo's $3.2 million dollars in equity (including $1 million receivable from Benun) that existed at the beginning of the bankruptcy (Siegal Dec. ¶ 5, Ex. 4), had turned into a $6 million deficit. Siegal Dec. ¶ 6, Ex. 5. On the other hand, over $25 million had been paid by Jazz Photo to Polytech, $8-10 million of which was paid to Leon Silvera's company Photo Recycling Enterprises ("PRE"), over $2.3 million paid to Agfa GmbH, and about $1 million ($15,000, then $12,500 per week plus benefits) paid to Benun. Siegal Ex. 5, last page. Miraculously, that money has also vanished, as all of those companies are out of business and Benun again cries poverty.

After Jazz Photo was ordered by Judge Stern to shut down its operations by March 1, 2003 (Siegal Ex. 2), Polytech and Agfa signed the Security Agreement which Agfa argues is able to secure its right to Jazz Estate assets, even though Jazz Photo had ceased operations and any new cameras were for the benefit of Jazz Products. Goldstein Ex. C. Agfa's only claim against the Jazz Estate was filed March 28, 2005 for $25,000. Siegal Ex. 6. On the other hand, on August 21, 2003, Fuji filed its Judgment Claim for $30,208,905.60 (Siegal Ex. 7) and on April 22, 2005, Fuji filed claims (including administrative claims) totaling almost $20 million. Siegal Ex. 8. Thus, it is clear that Agfa's claims against the Jazz Estate funds are negligible, compared to the claims of Fuji.

### B. The Source of the Attached Funds

In 2005, when Jazz Photo was about to be closed, it was on the verge of settling a lawsuit it had filed against Imation Corp. and Imation S.P.A. (collectively "Imation"). Siegal Ex. 2. Imation had been Jazz Photo's supplier of film, before Jazz Photo began purchasing film from Agfa. A settlement of the Imation litigation was being discussed, wherein Imation would pay $25 million dollars to the Jazz Estate. Jazz Photo, Polytech and other creditors objected to the settlement, because Fuji and Jazz Photo's attorneys would be the only substantial beneficiaries of that $25 million dollar settlement. Accordingly, in order to broker the settlement, Fuji agreed to the following and paid $1,000,000 of the $6 million it received to other unsecured creditors, including Polytech:

> 1. Fuji shall forego for the benefit of the holders of allowed unsecured claims in the Jazz bankruptcy proceedings… seventeen (17) cents of each dollar payable to Fuji in respect of any of Fuji's allowed claims in the Jazz Bankruptcy Proceedings **not to exceed $1,000,000 dollars** in the aggregate paid to the holders of the Limited Allowed Claims.
>
> 2. Jazz shall cease all sales in the ordinary course of business no later than March 1, 2005.

Siegal Ex. 3, Notice of Proposed Settlement of Controversy (emphasis added).

### C. The Jazz Liquidation Trustee Attempted to Fix the Amounts of the Various Claims Against the Jazz Estate

The Attached Funds represent money from the Imation settlement that was set aside by the Liquidating Trustee for partial satisfaction of Polytech HK's allowed administrative and pre-petition claims against the Jazz Estate. Polytech's claims against the Jazz Estate were fixed at $1,850,000 for its administrative (post-petition) claim and $1,427,240.84 for its unsecured pre-petition claim by an October 31, 2005 Stipulation between the Jazz Estate Trustee, Polytech and Agfa. Siegal Ex. 9 at ¶¶ 1, 2. Specifically, the Attached Funds represent Polytech HK's entire administrative claim, part of its unsecured claim, and accumulated interest. When the Liquidating Trustee makes his final distribution, if any, a small additional amount could be set

- 5 -

aside for Polytech HK as further partial payment of Polytech HK's unsecured claim. The additional small amount should be paid directly to Fuji.

### D. Agfa Contrived Its Claim Against the Jazz Estate

Unknown to Fuji, while the liquidation of Jazz Photo was under discussion, Benun was scheming to continue the operation of the refurbished camera business as seamlessly as possible, maintaining PRE as the supplier of shells, Agfa as the supplier of film and Polytech as the manufacturer of cameras from that film and shells. Agfa's parent was well aware of Fuji's patents and had agreed to a royalty bearing license with Fuji. Of course, it did not pay any royalties on the Polytech cameras made with Agfa film. As set forth in a February 1, 2005 e-mail from Jack Benun to Norbert Heenan of Agfa, Benun had been discussing a security agreement between Agfa and Polytech in connection with future film that would be supplied to Polytech and made into cameras after Jazz Photo had closed its doors. Siegal Ex. 10. Nevertheless, despite discussions regarding a security agreement, there is no indication when the Security Agreement was actually executed.

Agfa alleges (Brief at 3) that as of March 2005, Polytech owed Agfa over $500,000 for the cameras Agfa knew Polytech was selling to Jazz Photo, a company Agfa knew was teetering in bankruptcy. With Polytech's customer (Jazz Photo) closed down as a result of its patent infringement and by Order of the Bankruptcy Court, Agfa sought a way to keep selling Polytech film used in the infringing cameras. At some unknown date, Agfa signed the Security Agreement "effective" March 24, 2005. However, by its own terms (paragraph 4) that Security Agreement terminated by September 30, 2005. Goldstein Ex. C.

### E. Fuji Obtained the Writ Before the Security Agreement Was Recorded in New Jersey

On November 3, 2005, Fuji filed its Order to Show Case Why a Writ of Attachment Should Not Be Issued Against the Property of Defendant Polytech Enterprise, Ltd. D.E. 74. On that date, this Court issued a TRO, temporarily attaching the funds, for Fuji's benefit, until they were permanently attached for Fuji's benefit by Order entered November 16, 2005. D.E. 71, 90.

While the TRO was in place, and after Agfa received notice of Fuji's Motion for a Writ of Attachment, Agfa filed a UCC-1 Financing Statement with the New Jersey Dept. of Treasury, thereby purporting to perfect the expired/terminated Security Agreement between two Hong Kong companies in New Jersey. Goldstein Ex. E. As discussed below, such recordation had no legal effect.

At the November 15, 2005 hearing, the Court instructed Agfa to "make a motion" if Agfa felt it was entitled to any of the attached funds. Goldstein Ex. F. Two years passed without any such motion being filed. On August 14, 2007, Agfa was placed into liquidation. Agfa Brief at 2. Two more years passed and finally four years after the fact, Agfa filed its motion. In its motion, Agfa argues, without support, that its alleged security interest in Polytech's accounts receivable, was actually an assignment of a Jazz Estate asset to Polytech. They also argue that recording the security interest in New Jersey perfected their security interest on November 14, 2005 with priority to the Writ, notwithstanding the November 3rd TRO. For the reasons set forth below, Agfa's motion must be denied.

### F. The Bankruptcy Court May Have Fixed Agfa's Claims, But the Attached Funds Are Still the Property of the Jazz Estate

On November 9, 2005, while the TRO was in place, Agfa opposed Fuji's motion for the Writ. Agfa claimed to have an interest in the funds owed by the Jazz Photo estate to Polytech in the amount of $688,743.39, the amount now sought in Agfa's current motion. D.E. 81. On May 16, 2005, Judge Stern issued an Order permitting the sale of substantially all of Jazz Photo's assets, including its inventory of single use cameras, to Ribi Tech Products LLC ("Ribi Tech"). Siegal Ex. 11. The May 16, 2005 Order recites that Agfa alleged it had a lien or interest in the amount of $276,000 in some of the cameras being sold to Ribi Tech. Rather than rule that Agfa was entitled to this money, Judge Stern ordered that the Liquidating Trustee hold $276,000 of the proceeds from the sale of the assets in escrow (the "Agfa Escrow."), "pending further order of the Court . . . relating to Agfa's claim relating to the Assets or agreement between Agfa and

Debtor." Id. at ¶ 3. Agfa also claims that Polytech owes it an additional $412,749.39 under the Security Agreement for a total of $688,743.39. Agfa Brief at 8.

On November 4, 2005, Judge Stern approved an October 31, 2005 Stipulation between Polytech HK, Agfa and the Liquidating Trustee. Siegal Ex. 9. The Stipulation was not an adjudication of rights, but an agreement to settle Polytech's claims. For example, paragraph 5 of the Stipulation recites that "[t]he agreement by Polytech to reduce the Polytech Administrative Claim . . . is rather in the nature of a settlement made for the purpose of obtaining a prompt resolution and prompt payment of the claim . . . and shall not be admissible in any court or tribunal or as an admission of Polytech without Polytech's consent." Id. at ¶ 5.

The October 31 Stipulation also states that "pursuant to the Court's May 16, 2005 Order Authorizing the Debtor to Sell Substantially all of its Assets . . . the Trustee . . . has been holding in escrow the sum of $276,000 relating to the Agfa Claim (the 'Agfa Escrow');" and that on August 10, 2005, the Liquidating Trustee filed a motion seeking, inter alia, an order expunging the Agfa claim. Id. at 2, 3. Thus, the October 31, 2005 Stipulation implements an agreement between Agfa and Polytech, whereby Agfa's claims could be paid in full out of Polytech's administrative claim and not out of the Agfa Escrow. Paragraph 6 permitted the Liquidating Trustee to pay Agfa HK's lawyer the sum of $688,743.39 ($276,000 + $412,743.39) and to pay Polytech the remaining $1,161,256.70. Id. at ¶ 6. Paragraph 7 provides that upon the payment set forth in paragraph 6, the Liquidating Trustee shall no longer be required to maintain the Agfa Escrow. Id. at ¶ 7. Fuji did not object to fixing Polytech HK's claims in accordance with its rights under the Trust Agreement entered into to govern the liquidation of Jazz Photo but had no interest in or right to complain about the Polytech HK/Agfa agreement regarding the division of Polytech HK's administrative claims. Id. at 4.

On information and belief, the Liquidating Trustee is holding the Attached Funds and the Agfa Escrow in a common account that contains about $2.8 million, of which $276,000 is the Agfa Escrow. In order to expedite the resolution of this motion, Fuji, Agfa, Polytech HK and the Liquidating Trustee have agreed to authorize the Liquidating Trustee to pay the $276,000 Agfa

Escrow plus accumulated interest to Agfa. A written stipulation to this effect is being negotiated, but Polytech's counsel (Peterson) has withheld his final approval, even after the Stipulation has been approved by counsel for Agfa, Fuji and even the Jazz Trustee. The stipulation leaves Agfa's additional claim of $412,743.39 unpaid.

For the reasons set forth herein, Fuji submits that Agfa has no valid claim against the attached funds for this remaining sum of $412,743.39, at least in part because the Security Agreement Agfa relies on terminated in September 2005, and the UCC filing it relies on is ineffectual because it was recorded in the wrong jurisdiction and because the filing took place after the TRO. Security Agreement at ¶ 14. Accordingly, the entire Attached Funds (about $2.5 million) are the property of the Estate, owed to Polytech HK, subject to execution by Fuji, and should be paid to Fuji in partial satisfaction of its judgment against Polytech HK.

### III. LEGAL ANALYSIS

#### A. The Security Agreement has no Effect on Agfa's Claims Against the Jazz Estate

Agfa cannot claim to have a secured interest based upon the Security Agreement because any interest created by the Security Agreement (1) terminated by the Security Agreement's own terms on September 30, 2005 and (2) the Security Agreement was not perfected properly. As the Security Agreement no longer has any force and effect, and certainly fails to establish Agfa as a secured creditor, Agfa's interests constitute those of an unsecured creditor and are subordinate to Fuji's Writ of Attachment at issue.

The expired security interest does not survive merely because Agfa filed a financing statement in New Jersey long after the underlying Security Agreement expired. For example, in McFarland v. Brier, 850 A.2d 965 (R.I. 2004), a case cited by Agfa in its brief at page 8, n.2, the court addressed the issue of rescission in a similar context. The plaintiff in McFarland served a bank with a prejudgment writ of attachment. Id. at 970. The writ had been predated by a pledge agreement by approximately six months. Id. However, the trial court determined that the pledge agreement had been effectively rescinded by the parties. Id. at 971. Therefore, the later-served

- 9 -

writ of attachment was entitled to precedence over the prior perfected, but terminated, security interest.  Id.  In McFarland, the reviewing court determined that the pledge agreement had not, in fact, been rescinded.  However, it is clear from the court's ruling, that its determination of priority turned on whether the pledge agreement had terminated.  Id. at 972-3.  Accordingly, in the case at hand, the termination of the Security Agreement results in the superiority of Fuji's Writ of Attachment.

    B.  **Agfa Never Perfected Its Security Interest**

  Even if the Security Agreement were still in effect, this would not provide Agfa with a secured claim, because Agfa failed to properly perfect its security interest. The proper filing of a financing statement in order to perfect a security interest is paramount to the cases relied on by Agfa.  For example, Shaw Mudge & Co v. Sher-Mart Manufacturing Co, Inc., 132 N.J. Super. 517, 521 (App. Div. 1975) and Telefest, Inc. v. VU-TV, Inc., 591 F.Supp. 1368, 1381 (D.N.J. 1984) (Agfa Brief at 12), both rely on the fact that the financing statement was properly recorded in order to obtain priority over other creditors. However, not only has the Security Agreement at issue herein terminated, as explained in detail below, Agfa failed to file its financing statement in the proper jurisdiction.  As such, Agfa does not have a perfected security interest and thus is an unsecured creditor with an interest subordinate to Fuji's Writ of Attachment.

  The UCC-1 statement filed by Agfa with the New Jersey Secretary of State on November 14, 2005 (the "NJUCC Filing") did not perfect the grant of a security interest in "accounts" owed by Polytech to Agfa under the Security Agreement, inter alia, because it was filed in the wrong jurisdiction.  Goldstein Ex. E.  Under the Security Agreement, Polytech pledged to Agfa, as security for its obligations to Agfa under Security Agreement, a security interest in accounts receivable owing from Jazz Photo to Polytech as well as all other accounts receivable of Polytech and, in each case, the proceeds thereof.  However, under paragraph 14, the Security Agreement terminated on September 30, 2005.

On its face, the Security Agreement is governed by the law of the State of New York. Security Agreement at ¶ 23. Under Section 9-301(a) of the Uniform Commercial Code as in effect in the State of New York in 2005 (the "NYUCC"), the location of Polytech, as the party granting the interest, will determine the law that governs the perfection of the security interest granted by Polytech in favor of Agfa. Section 9-307(b) of the NYUCC indicates that to determine such location, one looks to Polytech's place of business, in this case, Hong Kong. If Polytech had more than one place of business (which it does not), it would in any event be deemed located at its main office, which once again, is Hong Kong.

Because Polytech is deemed located in Hong Kong, under Section 9-307(c), the laws of Hong Kong control perfection. Hong Kong law requires recordation in Hong Kong. Siegal Ex. 12. Under Hong Kong law, recording a security agreement between two Hong Kong corporations in New Jersey does not perfect that security interest. Id.

New Section 9-307(c) limits the applicability of Section 9-307(b) discussed above. Section 9-307(c) states that Section 9-307(b) only applies if such sole place of business or chief executive office is

> located in a jurisdiction whose laws generally requires information concerning the existence of a nonpossessory security interest to be made generally available in a filing, recording, or registration system as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral. If subsection (b) does not apply, the debtor is located in the District of Columbia.

Accordingly, based on the foregoing, the laws of Hong Kong will determine how to perfect the Security Agreement. Because Hong Kong has a recordation system, Polytech is deemed located in Hong Kong and the Security Agreement must be recorded in Hong Kong. If, however, Hong Kong did not have the appropriate recordation system, then Polytech is deemed located in the District of Columbia and the laws of D.C., determine how to perfect. As Washington, D.C. has adopted the UCC, if Polytech is deemed located in D.C., rather than Hong Kong, then Agfa would have had to file in Washington, D.C.

Regardless of whether Washington, D.C. or Hong Kong law controls, nothing in Agfa's motion papers provide any basis whatsoever for a New Jersey UCC filing to perfect Agfa's security interest. The fact that Jazz Photo was a New Jersey corporation or that the bankruptcy of Jazz Photo is being prosecuted in a New Jersey court, does not have any consequences under the NYUCC. Furthermore, as noted herein, under Section 14 of the Security Agreement, the Security Agreement terminated no later than September 30, 2005. Accordingly, the NJUCC Filing does not perfect anything as there is no longer an underlying security interest to perfect.

Perhaps knowing that its security interest was not recorded in the proper jurisdiction or was recorded after the TRO was in place, Agfa attempts to claim that it need not have properly recorded the Security Agreement. Agfa argues (Agfa Brief at 10) that its interest was "perfected upon the execution of the Security Agreement," based on a fallacious argument that it should fall under the UCC § 9-309(2) exception to the rule that properly recording a financing statement is required to perfect a security interest. However, as Agfa itself acknowledges (Agfa Brief at 10, n. 4), the very purpose of this exception is not met in this instance. As Agfa acknowledges, according to the comments to the UCC, the "purpose of paragraph (2) is to save from ex post facto invalidation casual or isolated assignments – assignments which no one would think of filing." Id. citing UCC § 9-309(2), cmt. 4. The very cases cited by Agfa reveal that this exception is designed to protect parties less sophisticated than Agfa, who have no experience with the filing of financing statements. U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC, 519 F.Supp. 2d 515, 529-30 (E.D.Pa. 2007). For example, the court in In re Barrington, 34 B.R. 55, 57 (Bankr. M.D. Fla. 1983), held that "the adoption of the rule tells commercial lenders that they fail to file at their peril and at the same time does not penalize a casual one-time lender who, in genuine innocence, accepts an assignment of over a certain percentage of business' accounts." Given that Agfa – a large, sophisticated organization by any measure, represented by able counsel – attempted to file the financing statement, this exception simply does not apply.

### C. The Financing Statement Was Recorded After Fuji Became a Lien Creditor

Even the recordation on November 14, 2005 of a non-terminated Security Agreement in the proper jurisdiction would not have moved Agfa ahead of Fuji, because Fuji became a lien creditor on November 3, 2005. Massachusetts Mutual Life Ins. Co. v. Central Penn Nat. Bank, 372 F.Supp. 1027, 1042 (E.D.Pa. 1974). An unperfected or later perfected security interest is subordinate to a pre-existing lien creditor, such as one who obtains a lien by obtaining a writ of attachment. Id. Accordingly, notwithstanding Agfa's other defects discussed above, Fuji's lien creditor status, by virtue of the November 3, 2005 TRO, followed, without interruption by the November 15 Writ, has priority over a pre-existing security agreement that was not recorded until November 14, 2005. Id.

In Mass. Mutual, Industrial Valley Bank's ("IVB") claim against a bankrupt was second in time to Central Penn and prior to a number of lien creditors, such as Mercantile Financial and Franklin National Bank. Id. However, before IVB recorded its security interest, Mercantile Financial obtained a writ attaching the bankrupt's assets. Id. The writ of attachment made Mercantile Financial a lien creditor on the date of the writ. Id. Likewise, Franklin National Bank obtained lien creditor status by virtue of a temporary restraining order issued by a different court. Id. at 1042-43 ("Section 9-301 [of the UCC] reserves lien creditor status for those creditors who acquire a lien by invoking the judicial process.") Thus, because a lien creditor, by virtue of a writ of attachment, stands ahead of a subsequently perfected owner of a security interest, Fuji stands ahead of Agfa even if the Security Agreement were in force and had been properly recorded on November 14, 2005.

### IV. CONCLUSION

Based on the foregoing, it is clear that Agfa failed to establish that it has a superior security interest by reason of its financing statement filed in New Jersey on November 14, 2005. The Security Agreement on which Agfa seeks to rely terminated by its own terms prior to the date of the Writ and thus no security interest survived at either the time of Agfa's filing or the

issuance of the Writ.  Moreover, even if a security interest still existed at the time of filing, Agfa failed to perfect its security interest because it filed its financing statement in the wrong jurisdiction. Finally, Agfa's argument that the Stipulation and Order dated October 31, 2005 created an assignment of property to Agfa before the Writ attached fails because the Stipulation and Order did not transfer "property" to Agfa, but simply established the amount of Agfa's claim. Accordingly, Agfa's motion to vacate Fuji's Writ of Attachment must be denied.

                                              Respectfully submitted,

Date: August 24, 2009

                                      MANDELBAUM, SALSBURG, GOLD, LAZRIS & DISCENZA, P.C.

                                      _s/ David Ward_____
David Ward
Arthur D. Grossman
155 Prospect Avenue
West Orange, New Jersey 07052
Tel:  (973) 736-4600

STROOCK & STROOCK & LAVAN LLP
Lawrence Rosenthal
Matthew W. Siegal
Angie M. Hankins
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for Plaintiff FUJIFILM Corp.*

- 14 -